UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LAVELLA. McGARY,

               Petitioner,

      v.

WILLIAM MUNIZ, Warden

               Respondent.

No.  2:15-cv-0807 KJM GGH P

FINDINGS AND RECOMMENDATIONS

*Introduction and Summary*

      Petitioner was found guilty of second degree murder with enhancements not relevant to the issue in this petition.  He was sentenced to an aggregate term of 40 years to life.  Several issues are raised:

    1.  violation of right to remain silent during police interviews;

    2.  exclusion of hearsay evidence which the defense desired to admit;

    3.  a <u>Brady</u> impeachment claim—the prosecution failed to produce impeachment evidence which discredited its forensic expert.

      None of these claims warrant a vacating of petitioner's conviction in this federal habeas proceeding.  The first issue is clearly procedurally defaulted (barred), and the remaining two

1

1   issues fail on their merits.  The petition should be denied.

2       *Factual Background*

3       The underlying facts of the case are useful for understanding the context of the issues.

4           A. The Prosecution's Case.

5           On June 26, 2008, the sister of co-defendant Daryl Gilmore (Daryl),
6       Shaandreia Gilmore (Shy), had an argument with the victim,
        Ronelle "Nelly" Rucks (Rucks), with whom she was romantically
7       involved.  During this argument, which was later reported to Daryl
        and defendant, Rucks threatened to kill Shy and her children.

8           Rucks was also romantically involved with Lashay Charleston
9       (Shay). Rucks, Shay and their son lived in Building R at the Marina
        Apartments on Maine Street in Vallejo. Shay knew Rucks also
10      dated Shy.

11          On June 27, 2008 at about 11:00 a.m., Shay was outside her
        apartment with Rucks's sisters, Valerie and Tawana, when Shy
12      drove up to the intersection of Marin and Pennsylvania in a
        burgundy-colored Nissan Pathfinder. With Shy in the Pathfinder
13      were Maguerite (Mumu) and Marguerite's young nephew. The
        women began arguing despite Shy's initial statement that she
14      wanted no trouble but simply to retrieve a pair of shoes she had
        given to Rucks. After five to ten minutes of arguing, Shy drove off
15      without getting the shoes and Marguerite walked to her sister's
        nearby apartment.

16          A short time later, Daryl called defendant and told him Shy was
        having trouble with Rucks. Daryl wanted to "talk" to Rucks and
17      asked defendant to come along for protection. Defendant agreed,
        and Daryl picked him up in Oakland in a green 1996 Mitsubishi
18      before returning to Vallejo via the Carquinez Bridge. Defendant,
        who was always armed, carried a Browning Buckmark .22 caliber
19      semiautomatic pistol loaded with 11 bullets.

20          At 1:03 p.m., Daryl was subject to a traffic stop for failing to pay
        the Carquinez Bridge toll. Although Daryl had no driver's license,
21      he was let go with a citation. Daryl then continued to the Marina
        Apartments and parked next to Building R on Marin Street. The
22      men entered the apartment complex and found Rucks, who was
        unarmed but accompanied by several men, including his brother
23      Roy. Daryl and Rucks conversed briefly before Daryl and
        defendant decided to leave.

24
        At about 1:30 p.m., Daryl and defendant exited through the
25      apartment complex gate and walked toward their car. Rucks
        followed them, passing through the gate before stepping onto the
26      sidewalk. At this point, defendant turned around and shot Rucks
        several times before running away. According to an eyewitness, as
27      defendant ran, he followed behind two women who were also
        running down the sidewalk. Once the two women disappeared
28      around the corner, defendant returned to Rucks, who was lying on

                                    2

the sidewalk. Standing over Rucks, defendant shot him several more times as Rucks tilted his head toward him and tried unsuccessfully to get up.

Defendant then quickly jumped into the car with Daryl, who had made a U-turn and was double-parked on the west side of the street facing north against traffic. The car sped away, turning right onto Pennsylvania Street and right again onto Sonoma Boulevard. Rucks, meanwhile, bled to death within a few minutes despite the assistance offered by Shay, who had run outside upon hearing gunshots, and other bystanders, and despite the quick arrival of medical personnel.

Daryl drove to the mobile home park in San Leandro where he lived in a two-story house at Unit One with his girlfriend, Jackie, the mobile home park manager. Daryl and defendant spent the night there before being located and arrested by Vallejo police officers the next day. Specifically, at about 5:00 p.m. on June 28, officers arrived at the mobile home park looking for Daryl, who ran past them before being arrested. The officers mistakenly had a warrant to search Unit Four rather than Unit One, so several officers "froze" Unit One while another officer left to obtain the correct warrant. At about midnight, the officers were able to lawfully enter Unit One, where they found and arrested defendant. They also found the murder weapon under a couch in an upstairs bedroom, as well as several hundred rounds of ammunition. Both Daryl's Mitsubishi and Shy's Pathfinder were parked outside.

Defendant was interviewed at the Vallejo Police Department from about 2:00 a.m. to 3:00 a.m. on June 29, 2008, by Detectives James Melville and Matthew Mustard. After being advised of and waiving his Miranda rights, defendant, for about 45 minutes, denied being in Vallejo the previous day and denied any knowledge of Rucks's murder. In fact, defendant insisted he had been "high all day yesterday" on "powder" (methamphetamines), "didn't even go to sleep last night," and "don't even remember how [he] got to Daryl's house in the first place." However, after further conversation, defendant eventually admitted being at the crime scene and shooting Rucks. Defendant explained that he feared for his life because Rucks had earlier threatened Shy and her children and because, when meeting with defendant and Daryl, Rucks and his colleagues had their hands in their shirts as if holding weapons. Further, as he and Daryl left the apartment complex, Rucks followed them out the gate, telling them he "could have kilt us inside of the building" if he wanted to. It was at that point, defendant insisted, that he shot Rucks until running out of bullets.

B. The Defense Case.

Several women who had been romantically involved with Rucks were permitted to testify regarding his violent nature. For example, Shay testified that, on February 25, 2007, she and Rucks were arguing in a store parking lot in Vallejo when Rucks broke her car windshield and threw her keys. A police officer arrived a short time later, and Shay told him Rucks had choked her twice. Shay later

signed a statement that Rucks had threatened to shoot up her house and kill everyone inside, although at trial she testified that her statements were false.

Makeba Fields testified that, in June 2008, Rucks hit her in the face after she became jealous of his involvement with another woman, causing her to be hospitalized. A few days later, Rucks grabbed her ponytail during an argument and slammed her head into a brick wall, causing another trip to the hospital. Nonetheless, Fields did not think Rucks had threatened to kill her because "[he] wasn't like that." Her statement was contradicted by Police Officer John Boyd, who testified that he observed a lump on Field's head the size of a silver dollar after he was dispatched to the hospital, and that she told him Rucks threatened: "I'm your boss and I'll kill you, bitch."

Myesha Williams testified that, on January 26, 2006, after meeting Rucks at his cousin's house, he requested a ride to the store. She complied with his request however, when she thereafter refused to drive him to Richmond, he told her: "You're either going to take me or get out." When Williams told him she was leaving, Rucks tried to take her keys, slapped her, and ultimately used one hand to choke her and the other to retrieve a gun from his pants. Rucks then put the gun to her head and told her to either get out or go with him, at which point Fields grabbed the keys, left the car and ran into the gas station to call the police. Rucks drove off after discovering Fields had mistakenly left the ignition key in the car.

Finally, Lakisha Gauner, who used to date Rucks and had a child with him, testified that, on April 20, 2005, Rucks punched her in the face with a closed fist during an argument at their apartment. When she went to the bathroom to call 911, Rucks threatened to hit her again. Then, in September of 2005, he punched her in the eye, dragged her to the couch and tried to smother her with a pillow. She went to a friend's house and called the police. On March 28, 2006, Rucks choked her with a heavy metal jewelry chain and, on July 2006, kicked her apartment door and threatened to beat her up if she didn't let him inside. Finally, in February 2008, Rucks became enraged when Gauner was late dropping off their son. He slapped her and pulled out some of her hair before putting the child in his van and driving away.

In addition to this testimony from Rucks's former girlfriends, defendant offered expert testimony from Dr. Randall Solomon, the medical director and senior supervising psychiatrist at California Medical Facility, regarding his problematic personal history and resulting cumulative mental trauma. Specifically, Dr. Solomon testified that, due to defendant's unstable and stressful upbringing, he lacked a sense of safety and was more prone to impulsive and over-reactive behavior when he felt threatened. Defendant's behavior at the time of Rucks's death was an example of this tendency to overreact in hostile environments. Dr. Solomon acknowledged, however, that he did not perform psychological tests on defendant and found no evidence of psychosis. Moreover, while defendant had a "constellation of symptoms" and "reactions" similar to persons suffering from post traumatic stress disorder

1

2

(PTSD), including increased aggression and hyper-alertness, Dr. Solomon concluded that defendant did not meet the criteria for PTSD.

3

C. Jury Deliberations, the Verdict and Sentencing.

4

5

6

7

On September 8, 2010, a jury found defendant not guilty of first degree murder but guilty of second degree murder. The jury also found true the enhancements for personal discharge of a firearm and personal discharge of a firearm causing great bodily injury. Following a sentencing hearing on June 27, 2011, the trial court imprisoned defendant for an aggregate term of 40 years to life. This appeal followed.

8

People v. McGary, 2013 WL 6713222 *1-2 (Cal. App. 2013) (footnotes omitted).

9

*Discussion*

10

The AEDPA legal standards are contained in Appendix A to these findings.  The first

11

issue, however, is decided on the grounds of procedural default, and those standards are discussed

12

below.

13

The Miranda Right to Remain Silent Issue

14

Petitioner insists here, as he did on direct review, that he several times asked the

15

interrogating police detective (a Detective Mustard) to cease questioning him in his post-arrest

16

interview, but the detective avoided his request by feigning confusion, followed by

17

encouragement of petitioner to continue interrogation.  The precise facts of the interrogation are

18

not important because petitioner's trial attorney, not only "failed to object" to admission of the

19

confession, but also affirmatively told the trial court that he *did not* object to the statement

20

coming into evidence.[1]

21

The Court of Appeal provided the context and procedural ruling for this issue:

22

23

24

At the outset of our inquiry, we must address the People's contention that defendant forfeited his Miranda claims by not raising them in the trial court. As the People point out, the California Supreme Court has not hesitated to reject Miranda claims on appeal based upon the well-established principle of forfeiture.

25

26

27

28

[1]  The undersigned has not investigated the strategy of defense counsel not to object to the very damaging admissions as no assertion of ineffective assistance of counsel has been brought forward by petitioner.  However, since the murder weapon was found in petitioner's residence, along with eyewitnesses documenting petitioner's involvement in the murder, defense counsel may well have been focusing upon the asserted lack of intent required for murder, and not petitioner's factual involvement in the murder *per se.*

Specifically, "'Evidence Code section 353, subdivision (a) allows a judgment to be reversed because of erroneous admission of evidence only if an objection to the evidence or a motion to strike it was "timely made and so stated as to make clear the specific ground of the objection." Pursuant to this statute, "'we have consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.'" [Citation.] [Citation.] 'To satisfy Evidence Code section 353, subdivision (a), the objection or motion to strike must be both timely and specific as to its ground. An objection to evidence must generally be preserved by specific objection at the time the evidence is introduced; the opponent cannot make a "placeholder" objection stating general or incorrect grounds (e.g., "relevance") and revise the objection later in a motion to strike stating specific or different grounds.' [Citation.]" (*See People v. Rundle* (2008) 43 Cal.4th 76, 116, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

Here, the record reflects that, while the trial court did conduct a hearing to determine the admissibility of defendant's statements during his custodial interrogation, this hearing was held on the People's written motion rather than on defendant's motion. Defense counsel, while filing several motions in limine regarding the admissibility of specific items of evidence, filed nothing in reply to the People's motion, and filed nothing otherwise related to the admissibility of his extra-judicial statements to detectives. In addition, at the hearing on the People's motion, defense counsel raised no argument that the detectives violated defendant's *Miranda* rights. Quite to the contrary, defense counsel advised the court, "I'm not objecting to the introduction of his statement." Further, defense counsel stated, "Yes, Your Honor," when the court then confirmed, "neither defendant is expressing any objection to the admission of the statements that were attributed to Mr. McGary as stated in the [prosecution's] Miranda motion filed July 6, 2010, is that a correct statement?" Based on defense counsel's confirmation, the trial court ruled that an evidentiary hearing with respect to defendant's statements would not be necessary.

The trial court thereafter sought additional confirmation from counsel when considering the People's request to grant with prejudice its motion to admit defendant's extra-judicial statements:

"[COURT:] There's no indication that I can see of any coercion on Mr. McGary's part. There's no indication that he unequivocally stood on his right to remain silent or unequivocally at any point in the interview withdrew, if you will, his consent to carry on with the interviews. [¶] And, as a result, it appears the court should rule that all of the statements that are represented in the *Miranda* motion itself will be admissible in Mr. McGary's trial; and that that order ... if another Judge is hearing the case, the ruling needs to be made such that it's binding now on the trial. Is there any objection to the Court specifying that that's the duration of the ruling, [defense counsel], regardless of whether the case is heard by this Judge or another Judge?

6

"[DEFENSE COUNSEL]: Well, Your Honor, I can tell the Court this morning that I do not object on *Miranda* grounds to the introduction of my client's statement. I received [the prosecutor's] motion to admit the statement and citations to authority regarding *Miranda*. And I have not filed any written objection, and I am not objecting this morning on *Miranda* grounds. So as to that issue, I have no objection. [¶¶]

"[COURT]: All Right. So the question is: *Do we have this order crystallized, and ruling, such that the People can depend on it without further concerns at the time of trial, regardless of who tries the case?* And I'm expecting that to be me, but things could happen. Is that agreeable, [defense counsel]?

"[DEFENSE COUNSEL:] Yes, it is, Your Honor." (Italics added.)

Thus, based at least in part on defense counsel's acquiescence, the trial court ruled defendant's statements admissible "with prejudice to all parties at trial."

Given this record, we agree with the prosecution that defendant has forfeited the right to challenge on Miranda grounds the admission of his extra-judicial statements to investigators. While our reasoning should already be well-understood by counsel, we nonetheless take time to reiterate it: "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal."' [Citation.] 'The reason for the requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.' [Citation.] [¶] ... [Moreover,] 'the objection must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.' [Citation.] What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. *A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.*" (*People v. Partida* (2005) 37 Cal.4th 428, 434–435 [italics added].)

Here, despite his counsel's clear and repeated insistence in open court that no *Miranda* challenge was being made, defendant

contends the forfeiture rule should not apply because, based on the People's motion, the trial court had reason to, and did, consider whether any *Miranda* violation had occurred. In doing so, defendant relies on a California Supreme Court case, *People v. Williams* (2010) 49 Cal.4th 405, 424, wherein the court declined to base its decision on the forfeiture rule, despite the defense counsel's failure to raise a *Miranda* objection below, because the People's motion to admit the defendant's extra-judicial statements "brought certain elements of the *Miranda* claim before the court, including the possibility that defendant had invoked his right to counsel at the outset of the first interrogation, and that his waiver of rights on that occasion was involuntary because of the officers' mention of the death penalty." (*Id*. at pp. 424-425.)

We do not find defendant's authority helpful in our case. First, contrary to defendant's suggestion, the high court in *People v. Williams* did not actually rely on the forfeiture principle when ruling; rather, it "[a]ssum [ed], without deciding, that defendant's claims were preserved" before concluding his claims lacked merit. (*Id*. at pp. 424–425.) Moreover, contrary to our defendant, the defendant in *People v. Williams*, did in fact testify at the lower court hearing that "he 'continually' invoked his right to counsel during several days of interrogation, but that his invocation was disregarded." (Id. at p. 425.) As the record set forth above demonstrates, neither defendant nor his counsel took any position contrary to the People's motion in this case, much less offered evidence or testimony suggesting a *Miranda* violation. As such, we stand by our conclusion that defendant has forfeited this issue. [footnote 11]

[Indeed, on this record, it appears defense counsel may have actually invited the purported error: "'The doctrine of invited error is designed to prevent an accused from gaining a reversal on appeal because of an error made by the trial court at his behest. If defense counsel intentionally caused the trial court to err, the appellant cannot be heard to complain on appeal.... [I]t also must be clear that counsel acted for tactical reasons and not out of ignorance or mistake.' In cases involving an action affirmatively taken by defense counsel, we have found a clearly implied tactical purpose to be sufficient to invoke the invited error rule. (*See* [citations].)" (*People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 49, quoting *People v. Wickersham* (1982) 32 Cal.3d 307, 330, disapproved on other grounds in *People v. Barton* (1995) 12 Cal.4th 186, 201.)" Here, defendant's counsel did more than acquiesce to the trial court's Miranda ruling, he "affirmatively joined" in it, and thus should not now be permitted to claim the court erred. (*People v. Coffman & Marlow, supra*, 34 Cal.4th at p. 49.)]

People v. McGary, 2013 WL 6713222, at *5-6.

Beyond peradventure of a doubt in this case, counsel did not object to the statement, and

affirmatively told the trial court that he had no objection.  As respondent argues, the

1   contemporaneous objection requirement precludes petitioner's argument on the merits of his

2   alleged <u>Miranda</u> violation.

3       This claim is procedurally defaulted.  Petitioner makes no challenge to the adequacy of the

4   contemporaneous objection rule, as well he could not, given the decades long case history

5   upholding the adequacy of this particular procedural default.  The Ninth Circuit has recognized

6   and applied California's contemporaneous objection rule, section 353 of the California Evidence

7   Code, which provides that a criminal defendant must make a timely objection to the admission of

8   evidence at trial in order to preserve a claim challenging that evidence on appeal, as grounds for

9   denying a federal habeas corpus claim under the doctrine of procedural default where there was a

10  failure to object at trial. <u>See</u>, e.g., <u>Fairbanks v. Alaska</u>, 650 F.3d 1243, 1256 (9th Cir. 2011);

11  <u>Inthavong v. Lamarque</u>, 420 F.3d 1055, 1058 (9th Cir.2005); <u>Paulino v. Castro</u>, 371 F.3d 1083,

12  1092–1093 (9th Cir.2004); <u>Melendez v. Pliler</u>, 288 F.3d 1120, 1125 (9th Cir.2002) (citing

13  <u>Garrison v. McCarthy</u>, 653 F.2d 374, 377 (9th Cir.1981)); <u>Vansickel v. White</u>, 166 F.3d 953, 957

14  (9th Cir.1999); <u>Bonin v. Calderon</u>, 59 F.3d 815, 842–843 (9th Cir.1995). <u>See also</u> <u>MacDonald v.</u>

15  <u>Paramo</u>, 2016 WL 1670524 (E.D. Cal. 2016). Under the contemporaneous objection rule,

16  California courts construe broadly the sufficiency of objection that preserves issues for appellate

17  review, focusing on whether the trial court had a reasonable opportunity to rule on the merits of

18  the objection.  <u>Melendez</u>, 288 F.3d at 1125.

19      Even assuming that the <u>Bennet v. Mueller</u>----- paradigm survives recent Supreme Court

20  cases reviewing and reversing Ninth Circuit refusals to apply the bar,[2] <u>see</u> e.g. <u>Johnson v. Lee</u>,

21  __U.S.__, 136 S.Ct. 1802 (2016), (not utilizing the three part burden/consistency analysis, but

22  simply relying on explicative state case authority), petitioner here had the burden here to produce

23  some evidence that the bar is not consistently applied.  He has not done so.

24      Indeed, as observed by the Court of Appeal, <u>see</u> footnote 11 to the Court of Appeal

25  opinion, *supra*, counsel's strategic determination has all the earmarks of invited error. <u>See</u>, e.g.,

26  <u>Leavitt v. Arave</u>, 383 F.3d 809, 832 (9th Cir. 2004) (recognizing that invited error doctrine may

27

28  [2]  <u>Bennett v. Mueller</u>, 322 F.3d 573, 585 (9th Cir. 2003).

1    be a valid basis for procedural default under habeas review where the state court clearly and

2    expressly invoked the invited error doctrine).

3           The finding that procedural bar can be applied does not end the analysis, as petitioner

4    might demonstrate cause and prejudice for the default.  This exception to procedural default

5    requires permissible "cause," i.e., a fact external to petitioner's defense which caused the default.

6    High v. Ignacio, 408 F.3d 585, 590 (9th Cir. 2005) (quoting Murray v. Carrier, 477 U.S. 478, 488

7    (1986)).  Objective factors that exemplify cause include interference by officials that makes

8    compliance with the state's procedural rule impracticable, a showing that the factual or legal basis

9    for a claim was not reasonably available to counsel, or constitutionally ineffective assistance of

10   counsel.  Murray, 477 U.S. at 488. Prejudice requires a finding of actual harm resulting from the

11   alleged constitutional violation.  Thomas v. Lewis, 945 F.2d 1119, 1123 (9th Cir. 1991).  If

12   petitioner cannot demonstrate cause and prejudice, his claim must be one which would cause a

13   fundamental miscarriage of justice if not reviewed on the merits, i.e., petitioner is actually

14   innocent of the conviction offense.  See Majoy v. Roe, 296 F.3d 770, 775–76 (9th Cir. 2002).

15          Petitioner does not argue cause and prejudice in the petition or traverse.  Nor is the

16   Miranda issue here one that implicates actual innocence.  That is, there is no justification for

17   finding here that petitioner gave incriminating statements *which were not true* and which were the

18   result of undue coercion.

19          Accordingly, this claim should be denied as being procedurally defaulted.

20   Exclusion of Defense Requested Hearsay Evidence

21          The Court of Appeal again thoroughly explicated the basis of this claim and its adverse-

22   to-petitioner ruling:

23                   Defendant contends the trial court erred by excluding from
                     evidence Shy's hearsay statement to Detective Mustard that Rucks's
24                   sisters shattered her apartment windows just before his murder.
                     This purported error was, according to defendant, prejudicial
25                   because "if the jury found [he] believed, based on his knowledge of
                     Rucks's and his sisters' behavior that they were violent towards Shy,
26                   Daryl and [defendant], that would have been a basis for acquittal of
                     second degree murder...."
27
                     "A trial court has broad discretion in determining relevancy, but it
28                   cannot admit evidence that is irrelevant or inadmissible under

10

constitutional or state law. [Citation.]  'The proponent of proffered testimony has the burden of establishing its relevance, and if the testimony is comprised of hearsay, the foundational requirements for its admissibility under an exception to the hearsay rule. [Citations.]   Evidence is properly excluded when the proponent fails to make an adequate offer of proof regarding the relevance or admissibility of the evidence. [Citations.]'   (*Ibid*.; see Evid.Code, § 1200, subd. (b).)"   (*People v. Blacksher* (2011) 52 Cal.4th 769, 819– 820.)  Such rulings will be overturned on appeal only upon a showing of abuse of that discretion. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070; *People v. Cudjo* (1993) 6 Cal.4th 585, 609.)

The record reflects that, at trial, Detective Mustard testified regarding his interview with Shy shortly after the murder. Relevant here, Detective Mustard testified over defense objections that Shy did not mention being scared of Rucks or being threatened by him. On cross examination, defense counsel asked Detective Mustard whether Shy told him "that the night before the shooting, Ronelle Rucks's sisters came over to her apartment and smashed out all her windows." [footnote 12: According to defendant, Shy's hearsay statement regarding the actions of Rucks's sisters was disclosed by the prosecution during discovery.] The prosecutor objected on hearsay and relevance grounds, and the trial court sustained the objection, barring any questions related to Rucks's sisters.

On appeal, defendant acknowledges that Shy's statement regarding the actions of Rucks's sisters is hearsay given that Shy did not appear for trial. However, defendant insists her statement is nonetheless admissible pursuant to Evidence Code section 356 and relevant to prove his state of mind for purposes of his self-defense theory. We disagree.

Evidence Code section 356 provides in relevant part: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party...." (Evid.Code, § 356.)   "However, this provision '"is necessarily subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced."'  (Citation; Legislative Committee Comment to Evid.Code, § 356.)   'The rule is not applied mechanically to permit the whole of a transaction to come in without regard to its competency or relevancy....' (Witkin, Cal. Evidence ... § 320, p. 283.)"   (*People v. Perry* (1972) 7 Cal.3d 756, 787 [fn. omitted].)  In this case, defendant theorizes the evidence is relevant to prove his state of mind, and specifically the legitimacy of his belief in the need to defend himself against Rucks, a theory the trial court rejected when sustaining the prosecutor's objections. We conclude the trial court's ruling was within the broad scope of its discretion, notwithstanding Evidence Code section 356.

In reaching this conclusion, we do not disagree with defendant's point that, in some cases, "one's fear of another may come from a threat either by that person, or a close associate." However, the threat, whether made by the victim or, as here, the victim's family member, still must be directed toward the defendant such that the

11

defendant's state of mind, rather than someone else's, is impacted:

"A person claiming self-defense is required to 'prove his own frame of mind,' and in so doing is 'entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear.' [Citation.] The defendant's perceptions are at issue, and threats from a family and its friends may color a person's perceptions of that group no less than threats from an individual may color a person's perceptions of that individual. A defendant who testifies that he acted from fear of a clan united against him is entitled to corroborate that testimony with evidence 'tend[ing] in reason to prove' that the fear was reasonable. (Evid.Code, § 210 [defining relevant evidence].) Threats from the group on the defendant's life would certainly tend in reason to make the defendant fearful. This is especially true where the group has a reputation for violence, and that reputation is known to the defendant. Such threats are relevant to the defendant's state of mind—a matter 'of consequence to the determination of the action' (ibid.)—and the trier of fact is entitled to consider those threats along with other relevant circumstances in deciding whether the defendant's actions were justified." (*People v. Minifie, supra*, 13 Cal.4th, at p. 1066 [italics added]. See also *People v. McKinnon* (2011) 52 Cal.4th 610, 666.)

Here, there is no evidence defendant was told about, or otherwise knew about, the alleged threatening acts by Rucks's sisters toward Shy. And, as defendant's own authority explains, "'a defendant's evidence of self defense is subject to all the normal evidentiary rules, including Evidence Code sections 350 [only relevant evidence is admissible] and 352.' [Citation.] Evidence of third party threats is relevant only if other evidence shows [the defendant's] fear of imminent harm. (*Ibid.*) Even then its probative value may be slight.... The more vague the threats, and the weaker the logical link between them and the defendant's actions, the more the court may be justified in excluding them." (*People v. Minifie, supra*, 13 Cal.4th at p. 1070.)

Based on these principles, the trial court could properly find this evidence irrelevant to defendant's state of mind and, thus, not admissible. Simply put, for purposes of proving self defense, "[r]easonableness is judged by how the situation appeared to the defendant," not a third party such as Shy. (*People v. Minifie, supra*, 13 Cal.4th at p. 1068.) The trial court's ruling to exclude this evidence thus stands.

People v. McGary, 2013 WL 6713222, at * 7-9.

The only case that need be cited to set forth clearly established federal law as enunciated

by the Supreme Court is Holmes v. South Carolina, 547 U.S. 319 (2006):

"[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal

12

trials." *United States v. Scheffer*, 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998); see also *Crane v. Kentucky*, 476 U.S. 683, 689–690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986); *Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983); *Chambers v. Mississippi*, 410 U.S. 284, 302–303, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *Spencer v. Texas*, 385 U.S. 554, 564, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967). This latitude, however, has limits. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane, supra*, at 690, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984); citations omitted). This right is abridged by evidence rules that "infring[e] upon a weighty interest of the accused" and are "'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Scheffer, supra*, at 308, 523 U.S. 303, 118 S.Ct. 1261, 140 L.Ed.2d 413 (quoting *Rock v. Arkansas*, 483 U.S. 44, 58, 56, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).

* * *

While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury. *See*, e.g., Fed. Rule Evid. 403; Uniform Rule of Evid. 45 (1953); ALI, Model Code of Evidence Rule 303 (1942); 3 J. Wigmore, Evidence §§ 1863, 1904 (1904). Plainly referring to rules of this type, we have stated that the Constitution permits judges "to exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S., at 689–690, 106 S.Ct. 2142, 90 L.Ed.2d 636 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); ellipsis and brackets in original). *See also Montana v. Egelhoff*, 518 U.S. 37, 42, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996) (plurality opinion) (terming such rules "familiar and unquestionably constitutional").

Holmes, 547 U.S. at 324, 326–27 (emphasis and bold added).

Here, petitioner focuses somewhat on the perceived unfairness in the trial court's allowance of the prosecution's hearsay statement and the refusal to allow his hearsay statement. However, petitioner's perception is misplaced. As the Court of Appeal clearly found, the statement about the alleged breaking of windows, or threats to do so, at the time Rucks shooting took place, was not known to petitioner. There was no evidence submitted concerning petitioner's awareness of the Shy statement to the detective at the time of Rucks' murder. Indeed,

13

1  the Court of Appeal found that it was only through the process of criminal discovery that the

2  defense became aware of the alleged Shy statement.  Because it was *petitioner's* state of mind at

3  the time of the killing which was at issue with respect to whether the hearsay statement should be

4  permitted, the statement sought to be admitted had no bearing whatsoever on that critical state of

5  mind.  No Holmes/Chambers error took place.

6  The Brady Claim

7      Petitioner believes that the prosecution's failure to release impeachment evidence

8  pertinent to its forensic expert requires a vacating of the conviction.  While there may well have

9  been significant evidence with which to impeach the state's expert,[3] pertinent to the expert's

10  credibility in general, this is a case where the expert evidence was technical surplusage.

11      The undersigned need not perform an entire Brady [v. Maryland, 373 U.S. 83 (1963)]

12  analysis in that the materiality of the impeachment in this case was very inconsequential.  The

13  undersigned assumes that the on-its face, significant impeachment evidence should have been

14  disclosed.  However, petitioner must show: that under Brady, "evidence is material 'if there is a

15  reasonable probability that, had the evidence been disclosed to the defense, the result of the

16  proceeding would have been different.'"  Strickler v. Greene, 527 U.S. 263, 280 (1999) (quoting

17  United States v. Bagley, 473 U.S. 667, 682 (1985)).

18      In this case, the multiple bullet wounds that caused the death of the victim were absolutely

19  undisputed.  The witness statements describing the aftermath of the shooting, including the death

20  agony of the decedent were undisputed.  The fact that the murder weapon was found in

21  petitioner's residence was undisputed.  Petitioner admitted that he shot the victim.  Yet, petitioner

22  argues that the misdeeds of the prosecution's experts in other cases would have turned the tide

23  against the prosecution case.

24      Rather, the forensic expert testimony in this case was only marginally necessary,

25  _____

26  [3]  According to the Court of Appeal, the expert had been shown to have: (1) a
history of alcohol abuse and arrest; (2) provided false and misleading testimony several times in

27  the past;(3) been dismissed from previous forensic pathology positions for poor work quality; and
(4) was involved in a Sonoma County case, People v. Pelfini (No. SCR30250), that was

28  ultimately dismissed due, according to defendant, to Dr. Gill's incompetence and dishonesty.

establishing that indeed the victim died on account of the shooting.  This was not a case where, for example, the forensic testimony on the angle of the bullet wound told the difference between murder and accidental death.  This was a multiple bullet wound death where the assailant had emptied his .22 caliber weapon into the victim.  While the testimony of the expert may have been required as a formality to place into the record a scientific cause of death, it was hardly material in the <u>Brady</u> sense vis-à-vis the shooter.[4]

---

[4]  As the Court of Appeal found:

> Here, the record makes clear Dr. Gill's testimony was far from the only evidence linking defendant to the murder.  In fact, Dr. Gill's opinions regarding the cause and medical details of Rucks's non-accidental death were not challenged by the defense at trial or on appeal and are, in any event, corroborated by testimony from eyewitnesses at the scene who described hearing two to three gunshots, a pause, follow[ed] by several more gunshots (for a total of eight to 10 bullets).  For example, several witnesses, including Matias Santini and Stephen Allen, who were working in an office building across the street from the Marina Apartments, testified that they first heard two or three gunshots and then, looking in the direction of those shots, saw the shooter, who was identified by two people as defendant (Shay and Lazzarotto), fire several more shots into another man lying just steps away on the sidewalk. Consistent with their testimony, Shay, who was in another apartment on the second floor of the same complex, heard several gunshots, ran outside, and saw Rucks lying on the side while defendant, holding a gun, was standing on the passenger side of a car parked on the street about 25 feet away. [footnote omitted.] In addition, Shay described watching as Rucks took his last few breaths just moments later. And police clerk Angela Cunha, who was present for the autopsy, observed about eight to 10 bullets being removed from Rucks's body. Finally, defendant's own lawfully-obtained admissions to police detectives of having fired at least five shots into Rucks were consistent with the testimony of these witnesses, and essentially put to rest any doubt as to his guilt. To the extent defendant's role in Rucks's death was a matter of dispute, it was his intent, not his manner of inflicting death, that was put to the jury.

> Under these circumstances, even assuming Dr. Gill's credibility as a witness would have been undermined by admission of the identified newly-discovered evidence, we nonetheless have no trouble concluding the jury's assessment of defendant's guilt would not have been materially affected. (*See People v. Delgado, supra*, 5 Cal.4th at p. 328.) Thus, we conclude the trial court acted well within the scope of its discretion in denying defendant's motion for new trial.

<u>People v. McGary</u>, 2013 WL 6713222, at *13.

1    The Court of Appeal was not AEDPA unreasonable in rejecting this claim.

2    *Conclusion*

3    Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must

4    issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  A

5    certificate of appealability may issue only "if the applicant has made a substantial showing of the

6    denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth in these

7    findings and recommendations, a substantial showing of the denial of a constitutional right has

8    not been made in this case.

9    Petitioner's claims in this habeas action have no ultimate merit.  Accordingly, IT IS

10   HEREBY RECOMMENDED that:

11        1.     The petition be denied; and

12        2.     The District Court decline to issue a certificate of appealability.

13   These findings and recommendations are submitted to the United States District Judge

14   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

15   after being served with these findings and recommendations, petitioner may file written

16   objections with the court.  The document should be captioned "Objections to Magistrate Judge's

17   Findings and Recommendations."  Any response to the objections shall be filed and served within

18   fourteen days after service of the objections.  Petitioner is advised that failure to file objections

19   within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v.

20   Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

21   Dated: October 2, 2016

22                          <u>/s/ Gregory G. Hollows</u>
                            UNITED STATES MAGISTRATE JUDGE
23

24

25

26   /McGary-Final

27

28
                                        16

1       Appendix A

2    AEDPA Standards

3          The statutory limitations of federal courts' power to issue habeas corpus relief for persons

4    in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

5    Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

6    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the

7    judgment of a State court shall not be granted with respect to any claim that was adjudicated on

8    the merits in State court proceedings unless the adjudication of the claim–

9    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

10   established Federal law, as determined by the Supreme Court of the United States; or

11   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

12   the evidence presented in the State court proceeding.

13         For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings

14   of the United States Supreme Court at the time of the last reasoned state court decision.

15   Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, ___ U.S.

16   ____, ____, 132 S.Ct. 38, 44 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing

17   Williams v. Taylor, 529 U.S. 362, 405–06, 120 S.Ct. 1495 (2000)).  Circuit precedent may not be

18   "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal

19   rule that th[e] [Supreme] Court has not announced."  Marshall v. Rodgers, ___ U.S. ____, ____,

20   133 S.Ct. 1446, 1450 (2013) (citing Parker v. Matthews, ___ U.S. ____, ____, 132 S.Ct. 2148,

21   2155 (2012)).  Nor may it be used to "determine whether a particular rule of law is so widely

22   accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be

23   accepted as correct. Id.

24         A state court decision is "contrary to" clearly established federal law if it applies a rule

25   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

26   precedent on "materially indistinguishable" facts.  Price v. Vincent, 538 U.S. 634, 640, 123 S.Ct.

27   1848 (2003).  Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court

28   may grant the writ if the state court identifies the correct governing legal principle from the

17

1   Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

2   case.  Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003); Williams, 529 U.S. at 413;

3   Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this regard, a federal habeas court "may

4   not issue the writ simply because that court concludes in its independent judgment that the

5   relevant state-court decision applied clearly established federal law erroneously or incorrectly.

6   Rather, that application must also be unreasonable."  Williams, 529 U.S. at 412.  See also Schriro

7   v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933 (2007); Lockyer, 538 U.S. at 75 (it is "not

8   enough that a federal habeas court, in its independent review of the legal question, is left with a

9   'firm conviction' that the state court was 'erroneous.' ").  "A state court's determination that a

10  claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on

11  the correctness of the state court's decision."  Harrington v. Richter, 562 U.S. 86, 101, 131 S.Ct.

12  770 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004)).

13  Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner

14  must show that the state court's ruling on the claim being presented in federal court was so

15  lacking in justification that there was an error well understood and comprehended in existing law

16  beyond any possibility for fairminded disagreement."  Harrington, 562 U.S. at 103.

17        The court looks to the last reasoned state court decision as the basis for the state court

18  judgment.  Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).

19  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a

20  previous state court decision, this court may consider both decisions to ascertain the reasoning of

21  the last decision.  Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).

22  "[Section] 2254(d) does not require a state court to give reasons before its decision can be

23  deemed to have been 'adjudicated on the merits.'"  Harrington, 562 U.S. at 100. Rather, "[w]hen

24  a federal claim has been presented to a state court and the state court has denied relief, it may be

25  presumed that the state court adjudicated the claim on the merits in the absence of any indication

26  or state-law procedural principles to the contrary."  Id. at 784-85. This presumption may be

27  overcome by a showing "there is reason to think some other explanation for the state court's

28  decision is more likely."  Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803, 111 S.Ct.

1   2590 (1991)).  Similarly, when a state court decision on a petitioner's claims rejects some claims

2   but does not expressly address a federal claim, a federal habeas court must presume, subject to

3   rebuttal, that the federal claim was adjudicated on the merits.  Johnson v. Williams, ___ U.S.

4   ____, ____, 133 S.Ct. 1088, 1091 (2013).

5          When it is clear, however, that a state court has not reached the merits of a petitioner's

6   claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

7   habeas court must review the claim de novo.  Stanley, 633 F.3d at 860.

8          The state courts need not have cited to federal authority, or even have indicated awareness

9   of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 8, 123 S.Ct. 362,

10  365 (2002).  Where the state court reaches a decision on the merits but provides no reasoning to

11  support its conclusion, a federal habeas court independently reviews the record to determine

12  whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v.

13  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo

14  review of the constitutional issue, but rather, the only method by which we can determine whether

15  a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no

16  reasoned decision is available, the habeas petitioner still has the burden of "showing there was no

17  reasonable basis for the state court to deny relief."  Harrington, 562 U.S. at 98.  A summary

18  denial is presumed to be a denial on the merits of the petitioner's claims.  Stancle v. Clay, 692

19  F.3d 948, 957 & n. 3 (9th Cir. 2012).  While the federal court cannot analyze just what the state

20  court did when it issued a summary denial, the federal court must review the state court record to

21  determine whether there was any "reasonable basis for the state court to deny relief."  Harrington,

22  562 U.S. at 98.  This court "must determine what arguments or theories...could have supported,

23  the state court's decision; and then it must ask whether it is possible fairminded jurists could

24  disagree that those arguments or theories are inconsistent with the holding in a prior decision of

25  [the Supreme] Court."  Id. at 786.  "Evaluating whether a rule application was unreasonable

26  requires considering the rule's specificity.  The more general the rule, the more leeway courts

27  have in reaching outcomes in case-by-case determinations.'"  Id.  Emphasizing the stringency of

28  this standard, which "stops short of imposing a complete bar of federal court relitigation of claims

1  already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a

2  strong case for relief does not mean the state court's contrary conclusion was unreasonable."  Id.

3  The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state

4  court to deny relief.'"  Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013) (quoting Harrington,

5  562 U.S. at 98).

20